**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROGER S. BORGO,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 16 C 2072** |
| **v.** ) | |
| ) | **Honorable Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** ) | |
| **Commissioner of Social Security[1]** ) | |
| ) | |
| **Defendant.** ) | |

<u>**Memorandum Opinion and Order**</u>

MICHAEL T. MASON, United States Magistrate Judge:

Claimant Roger S. Borgo ("Claimant") brings this motion for summary judgment [12] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for disability insurance benefits under §§ 416(i) and 423(d) of the Social Security Act (the "SSA"). The Commissioner filed a cross-motion for summary judgment [19], requesting that this Court uphold the decision of the Commissioner. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment is granted, and the Commissioner's cross-motion is denied.

**I. BACKGROUND**

**A. Procedural History**

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

On April 27, 2012, Claimant filed an application for a period of disability and Disability Insurance Benefits ("DIB"), alleging an onset of disability of March 29, 2007. (R. 18.)  His date last insured was March 31, 2013.  (R. 19.)  The Social Security Administration initially denied his claim on July 13, 2012, and upon reconsideration on March 18, 2013.  (R. 18.)  Claimant filed a timely request for a hearing on April 22, 2013.  (*Id.*)  On June 2, 2014, Claimant appeared with counsel before Administrative Law Judge ("the ALJ") David R. Bruce.  (R. 18, 29.)  On September 10, 2014, the ALJ issued a written decision denying Claimant's request for benefits.  (R. 18-28.)  Claimant filed a timely request for review; and the Appeals Council denied this request on December 11, 2015, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-3, 7-8); 20 C.F.R. § 416.1481; *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Claimant subsequently filed this action in the District Court.

### B.  Medical Evidence

Claimant seeks DIB for disabling conditions stemming from sarcoidosis, asthma, chronic diarrhea, allergic rhinitis, disorders of lipoid metabolism, mild cardiomegaly, kyphosis of the thoracic spine, and a thyroid disorder.  (R. 21.)

### 1.  Treating Physicians

Claimant's medical records date back to April of 2007, when he was treated at Loyola University Medical Center ("Loyola").  (R. 254.)  Claimant was seen in the emergency room on April 3, 2007, at which time the physician noted that he had multiple bruises and swelling on his lower legs.  (*Id.*)  Claimant informed the physician that he was seen by an immediate care center four days previously and was told that he had spots on his lung.  (*Id.*)  Claimant also told the physician that he had been feeling

fatigued and had experienced intermittent diarrhea and shortness of breath over the past year. (R. 254, 257.) The physician performed a chest radiograph on Claimant and determined that he had a possible nodule on his lung as well as multiple enlarged lymph nodes. (R. 262-63.) He was discharged the same day. (R. 258.)

Claimant returned to Loyola on April 10, 2007, and was seen by Dr. Michael Gill. (R. 269.) He informed Dr. Gill that he was in good health until the end of March. (R. 267.) Dr. Gill noted his suspicions that Claimant might have sarcoidosis rather than a neoplastic process. (*Id.*) At an initial pulmonary consultation on April 11, 2007, Claimant said that he had not felt like himself for the past year, but that his problems have increased over the past few weeks. (R. 272.) The physician agreed that Claimant had dyspnea and mediastinal lymphadenopathy, and stated that he suspected Lofgren's syndrome due to Claimant's sarcoidosis. (R. 274.) Claimant was started on Prednisone. (*Id.*)

On May 23, 2007, Claimant returned to Loyola for a pulmonary follow-up regarding his sarcoidosis. (R. 277.) He informed Dr. Daniel Dilling that he felt better overall, had more energy, and that the diarrhea had improved. (*Id.*) Claimant's bruising was gone, and he appeared better since starting the Prednisone. (*Id.*)

Claimant went to the Loyola emergency room on June 4, 2007, complaining of difficulty breathing, increased pain on the right side of his face, blisters on the tongue and chin, and neck swelling. (R. 283-84.) He had an otolaryngology consultation, and the consult assessed an "apparent zoster of right V3 distribution." (R. 287-88.) Claimant was discharged the same day. (R. 289.) On July 11, 2007, Claimant returned to Loyola for a pulmonary consultation. (R. 291.) Dr. Dilling noted that Claimant's

trigeminal zoster had improved and that Claimant's chest x-ray showed a vast improvement in his adenopathy as compared with April 2007.  (R. 291-92.)  Dr. Dilling also documented that Claimant's symptoms had improved, but he was still breathless, experiencing depressive symptoms, and had diarrhea.  (*Id.*)  Dr. Dilling further commented that Claimant's symptoms, the zoster, and depression created reason to suspect Claimant was not tolerating therapy.  (R. 294.)  Dr. Dilling recommended a tapering off of Prednisone over three weeks.  (*Id.*)

On August 28, 2007, Claimant saw Dr. Gill at Loyola.  (R. 298.)  Dr. Gill noted that the Prednisone had been tapered off about a month ago and that the sarcoidosis has responded well, but that Claimant complained of other symptoms such as diarrhea, fatigue, and joint pain.  (*Id.*)  Claimant was next seen by Dr. Gill on September 11, 2007.  (R. 303.)  According to Dr. Gill, Claimant continued to be fatigued and experienced the same symptoms he did when he first presented with erythema nodosum and the pulmonary sarcoidosis was identified.  (*Id.*)  Dr. Gill reported being suspicious of the extra-pulmonary sarcoid symptoms and wondered if a low dose of Prednisone would clear up the symptoms.  (R. 304.)   Dr. Gill documented that Claimant had a pulmonary appointment the following week, and if his conditions worsened, he would recommend going back on Prednisone.  (*Id.*)

On October 15, 2007, Claimant saw Dr. Dilling for a pulmonary consultation, and Dr. Dilling reported that Claimant's energy was better, but not normal.  (R. 306.)  Additionally, Dr. Dilling noted that Claimant's lungs were "grossly clear."  (R. 307.)  Claimant was next seen by Loyola medical staff on September 23, 2008.  (R. 312.)  During that visit, the treating physician noted that Claimant has become more fatigued

over the past six months and had increased joint and eye pain. (*Id.*) The physician observed that Claimant acted depressed and admitted to depression because of his health issues. (*Id.*) Claimant was prescribed Lexapro for his symptoms. (R. 314.)

The next visit in Claimant's records was on September 28, 2012, when Claimant was seen by Dr. Titilayo Abiona at Oak Forest Hospital. (R. 342.) Claimant informed Dr. Abiona that he was experiencing pain of the lower left quadrant as well as chronic lower back pain and bilateral lower extremity pain. (*Id.*) Additionally, Claimant informed Dr. Abiona that he experienced a tightening of his chest and pain when he cut his lawn and was experiencing diarrhea. (*Id.*) He reported taking Tylenol or Aspirin for relief. (*Id.*) A creatinine kinase was ordered, and a colonoscopy was scheduled for December 12, 2012. (R. 344.)

On October 2, 2012, Claimant was again seen by Dr. Abiona at Oak Forest Hospital. (R. 333.) A chest exam revealed kyphosis of the thoracic spine. (*Id.*) Dr. Abiona also stated that Claimant possibly had an enlarged liver with a fatty infiltration, as well as a mild cardiomegaly and mild peripheral pulmonary congestion, and he recommended a follow-up and clinical evaluation. (*Id.*) Additionally, a one-cm size soft tissue nodule was noted on a chest x-ray, and further evaluation with a CT scan of the chest was advised. (*Id.*) A Doppler Arterial study of Claimant's legs was performed on October 10, 2012, and the study returned normal results. (R. 434.) Claimant was seen for a follow-up visit with Dr. Abiona on November 30, 2012. (R. 336.) Dr. Abiona noted that Claimant was experiencing stomach pain and diarrhea. (*Id.*) Upon discharge, the plan was to have a pulmonology consultation and a colonoscopy. (R. 340.)

Claimant was again seen at Oak Forest Hospital on January 24, 2013, at which time the treating physician again noted that Claimant possibly had an enlarged liver with a fatty infiltration. (R. 329.) Claimant had a January 30, 2013 pulmonary outpatient visit with Dr. Patricia Macias and reported that he self-discontinued his Prednisone in 2007 because of side effects and that he had not been on any medications since then. (R. 346.) Claimant informed Dr. Macias that his respiratory symptoms never improved and that he had generalized pain and sinus problems. (*Id.*) He also reported that he lost his medical insurance. (*Id.*) Dr. Macias prescribed several medications, including Prednisone, and recommended pulmonary rehabilitation. (R. 348.)

On March 27, 2013, Claimant had a follow-up visit with Dr. Macias. (R. 420.) He explained that the steroids he was on were not working and that he had been experiencing severe chest pain. (*Id.*) Claimant's wife expressed her disagreement about the test results and medications, but Dr. Macias reassured her and asked her to allow Claimant to take the medications as prescribed. (*Id.*) A CT scan was ordered. (*Id.*)

Claimant saw Dr. Abiona on April 12, 2013, and informed him that he had been experiencing fatigue, chest pain, low back pain, and that he wanted his kidneys evaluated. (R. 408.) Dr. Abiona stated that Claimant had undergone numerous tests, including a colonoscopy, all with normal results, but that Claimant and his wife were not satisfied with those tests. (*Id.*) Dr. Abiona was also informed that Claimant had not been using the medications that he was prescribed. (*Id.*) A lumbar spine Comp AP showed early osteoarthritis, but no acute changes or fracture. (R. 396.)

On April 17, 2013, Claimant saw Dr. Macias for a pulmonary outpatient visit.  (R. 416.)  Dr. Macias noted that the CT of his chest was normal.  (*Id.*)  She also documented that Claimant was uninterested in going to physical therapy to improve his pain and that he felt he should be resting instead of working in physical therapy.  (*Id.*)  Notably, Dr. Macias stated that she found it "very difficult to believe that all the symptoms [Claimant] has are secondary to sarcoidosis. . . since he is not improving with the appropriate therapy and all the testings are normal."  (*Id.*)  She opined that Claimant might benefit from anxiety therapy.  (*Id.*)

Claimant saw the Lung Heath Educator in Oak Forest on April 17, 2013, and demonstrated improved spacer technique post-encounter.  (R. 414.)  On April 30, 2013, Claimant had a CT scan, which showed no abnormalities of the lungs, no enlargement of the liver, and was overall a normal CT of the abdomen and pelvis.  (R. 405.)  Claimant saw Dr. Abiona on May 1, 2013 and had continued complaints of shortness of breath, fatigue, and occasion left-sided chest pain.  (R. 401.)  He was instructed to follow up in four months.  (R. 407.)

On July 17, 2013, Claimant presented for a pulmonary follow-up visit with Dr. Macias and completed a ventilation scan with normal perfusion.  (R. 392.)  Dr. Macias noted that although Claimant was referred to pulmonary rehabilitation, he declined to continue with therapy.  (*Id.*)  She, again, stated that Claimant's symptoms were out of proportion to the physical findings and that he was not responding to any treatment.  (R. 393.)  Dr. Macias questioned whether Claimant had a component of depression.  (*Id.*)  Claimant had an ophthalmology outpatient follow-up on August 7, 2013, at which time he showed no signs of uveitis.  (R. 390.)

On August 21, 2013, Claimant was again seen at Oak Forest Hospital by Dr. Abiona, who stated that all of Claimant's tests had come back normal. (R. 372.) Claimant next saw Dr. Abiona on October 30, 2013, and the doctor remarked that Claimant's symptoms remained largely unchanged and that he had additional complaints of leg cramps and bloating. (R. 366.) Dr. Abiona recommended Claimant seek a second opinion regarding sarcoidosis at the University of Illinois Chicago Hospital ("UIC"), but Claimant declined. (*Id.*) Claimant started medication for hypothyroidism and was given medication to take as needed for his lower back pain. (R. 366, 370.)

On January 15, 2014, Claimant presented for a pulmonary outpatient follow-up to Dr. Macias and stated that he had the same chronic symptoms and felt about the same. (R. 379.) He finished a course of Prednisone a month prior and reported no improvement in his symptoms. (*Id.*) He declined pulmonary rehabilitation because he felt too weak to do the exercises, and he also stated that he wanted to think about getting a second opinion at the sarcoidosis clinic at UIC before agreeing. (*Id.*) Dr. Macias ordered a follow-up visit in six months and noted that Prednisone and Methotrexate did not appear to improve his symptoms. (R. 381.)

Claimant saw Dr. Abiona on February 7, 2014 and reported that his symptoms were mainly unchanged. (R. 360.) Dr. Abiona again recommended Claimant get a second opinion regarding sarcoidosis at UIC, and Claimant responded that he was leaning towards doing so. (*Id.*) With respect to Claimant's chronic diarrhea, Dr. Abiona noted that Claimant's colonoscopy was negative, and he was referred to a gastrointestinal ("GI") specialist. (R. 364.) On March 10, 2014, during a GI outpatient

visit, Dr. Satya Mishra diagnosed Claimant with chronic diarrhea. (R. 387.) On April 4, 2014, a gastrointestinal study was performed on Claimant. (R. 357.) Mild degenerative arthritis and spurs in the lumbar spine were noted, as well as a slight irregularity in Claimant's colon. (*Id.*)

On May 20, 2014, Claimant saw Dr. Nadera Sweiss, a specialist in the area of sarcoidosis, at UIC. (R. 442.) She discussed his employment background, specifically his exposure to dust and aspartame while working for a food company. (*Id.*) Dr. Sweiss noted that Claimant was diagnosed with sarcoidosis in March 2007, and he stopped working at that time. (*Id.*) Claimant had been on and off Prednisone for sarcoidosis since 2007, and the medication created other problems, including leg pain, dizziness, burning, anger issues, etc. (R. 442-43.) Dr. Sweiss determined that Claimant was affected by sarcoidosis, his history of steroid use, and shortness of breath, and that medical staff would restage the disease to decide if there was a need for steroids or steroid-sparing therapy. (*Id.*)

### 2. Agency Consultants

Dr. Mahesh Shah conducted an internal medicine consultative examination of Claimant's case for the Bureau of Disability Determination Services on June 27, 2012. (R. 321.) Dr. Shah noted that he spent about 35 minutes completing the evaluation, which included reviewing the previous reports, taking history, examining Claimant, and dictating his report. (*Id.*) Dr. Shah concluded that Claimant does have pulmonary sarcoidosis, but does not have any symptoms from the lungs. (R. 324.) According to Dr. Shah, Claimant's cramping in his abdomen and diarrhea could be due to involvement of the bowels with sarcoidosis. (*Id.*) Finally, Dr. Shah stated that

Claimant's cramping in his legs and feet could be related to muscle involvement with sarcoidosis, but that his circulation and nerve tests were normal. (*Id.*)

On July 12, 2012, Dr. Reynaldo Gotanco conducted a consultative examination. (R. 86.) Dr. Gotanco noted that Claimant's medical evidence reports pulmonary sarcoidosis, but that Claimant did not have any symptoms from his lungs. (*Id.*) According to Dr. Gotanco, cramping in the abdomen and diarrhea that could be due to involvement of the bowels with sarcoidosis, and cramping in the legs and feet could be related to muscle involvement with sarcoidosis. (*Id.*) Dr. Gotanco opined that Claimant had the following medically determinable impairments: sarcoidosis and "other disorders of gastrointestinal system," but that the impairments did not significantly limit his physical or mental ability to do basic work activities. (R. 87.) Further, Dr. Gotanco found that Claimant was partially credible, in part citing to the fact that he complained of shortness of breath but that the objective medical evidence noted good breath sounds bilaterally. (*Id.*)

On March 15, 2013, Dr. Phillip Galle conducted a third consultative examination at the reconsideration level. (R. 90.) Dr. Galle stated that while the evidence indicates sarcoidosis, Claimant does not have any symptoms in his lungs and his circulation and nerve tests were normal. (R. 93.) Dr. Galle further noted that cramping in the abdomen and diarrhea could be due to involvement of the bowels with sarcoidosis. (*Id.*) He found that Claimant's impairments did not significantly limit his physical or mental ability to do basic work activities. (*Id.*) As a result, Dr. Galle concluded that the evidence as a whole, both medical and non-medical, do not support a decision that Claimant is

disabled. (R. 92, 94.) No Residual Functional Capacity ("RFC") assessments were noted to be associated with the claim. (R. 94.)

### C. Claimant's Testimony

Claimant testified before the ALJ on June 2, 2014. (R. 33.) He was 55 years old at the time of the hearing. (R. 84.) He testified that he last worked as a truck driver back in 2007, but that he waited until 2012 to apply for benefits because he was hoping to get better and return to work. (R. 39.) However, he never recovered. (*Id.*) Claimant previously worked a factory job for twenty years at Kraft Foods mixing batches of Crystal Light product, which had aspartame in it. (R. 42.) The factory was a very dusty environment, and Claimant thought that may have started the sarcoidosis, but he did not know for sure. (R. 42-43.)

While working for Kraft, Claimant lifted one hundred-pound bags and was on his feet at least six hours a day. (R. 43.) However, he explained that he stopped being able to do that and switched roles to running a case packer, which required him to put cases into a machine. (*Id.*) According to Claimant, this job was a lot easier and he never had to carry over twenty pounds. (R. 44.) Moreover, he sat for more than half of the work day. (R. 44-45.)

Claimant testified that his position running a case packer was his last job at Kraft before he left. (R. 45.) After Kraft, Claimant was a truck driver for almost three years at Eagle Express Lines doing short hauls. (R. 42, 45.) This job required Claimant to crank trailer jacks up, pull canvases, etc. (R. 46.) Claimant stated that he never lifted more than fifty pounds. (*Id.*) He then remarked that during his second year working this job, his diarrhea became a problem. (R. 46-47.) He became concerned that he would not

make it in time to a bathroom when he was driving. (R. 47.) The diarrhea became so bad that Claimant stopped eating as much or would not eat until he got home. (*Id.*)

Claimant stopped working at the end of March 2007. (*Id.*) A couple of weeks prior to stopping work, Claimant testified that he began having pain in his feet and legs, cramping in his legs, and trouble walking. (*Id.*) Claimant remarked that he could barely walk and eventually began to have difficulty even standing. (R. 47-48.) His legs were black and blue. (R. 48.) He went to a clinic, where he had x-rays of his lungs, which revealed spots on his lungs, and the doctor informed Claimant that she thought he had sarcoidosis. (*Id.*)

He explained that he was not treated anywhere other than Loyola in the beginning because there was not much that could be done for his condition. (R. 39.) He was put on Prednisone off and on at various times because that was all the doctors could do, but he was not on it at the time of his testimony. (R. 39-40.) Claimant explained that he is currently seeing a lung specialist at Oak Forest Hospital, as well as a gastrointestinal doctor, and a doctor at UIC. (R. 49.) He testified that he is currently on a thyroid medication and arthritis medication; however, the medications are not working. (R. 49-50.)

Claimant noted that he also has sinus headaches and takes over-the-counter medication. (R. 53-54.) Additionally, he sees an eye doctor, as his doctors think there might be sarcoidosis in his eyes. (R. 54.) Claimant stated that he has problems sleeping because of his legs and shortness of breath. (*Id.*) Claimant commented that the last doctor he saw stated that the problems he has been having with his stomach

are likely related to sarcoidosis and that nothing regarding the cramping has shown up in the blood work. (R. 56.)

Claimant testified that he lives with his wife and also lived with his wife's uncle for some time. (R. 41.) He explained that his wife's uncle was disabled, and he was informed that he could receive some money for taking care of the uncle, mainly by making his meals. (*Id.*) Claimant stated that he only made a few hundred dollars a year making meals, and that was the only employment he had until the uncle passed away. (R. 41-42.)

Claimant prefers cold weather because humid and hot air causes difficulties breathing. (R. 51.) He further explained that he has chronic pain in his feet and legs and cramping in his legs that never goes away. (*Id.*) The pain becomes greater the more he walks or if he sits for long periods of time. (R. 52.) The only way to relieve the pain is by lying on the couch and putting his legs up. (*Id.*) Claimant stated that the longest he can sit for any one time is about an hour or two. (*Id.*) He does not like to be on his legs for more than an hour. (R. 53.) He occasionally goes grocery shopping at smaller stores and will put the items away before needing to lie down. (*Id.*)

Claimant remarked that he can walk around the block, but by the end, his legs will cramp up. (R. 53.) The greatest weight he feels comfortable carrying is a gallon of milk. (*Id.*) He testified that he washes dishes, pays bills, and throws out the trash. (R. 54-55.) He will mow the grass when it is cooler outside because he has a small lawn; however, he gets sweaty and has to sit down for a while. (R. 55.) He also testified that he does not have problems caring for himself, and he will sometimes sit in his yard to

read, but he does not do much for fun. (*Id.*) He cannot exercise because he will just feel worse. (R. 56.)

The questioning then turned back to Claimant's stomach problems. Claimant stated that on a bad day, he would urgently have to get to the restroom between three and six times. (R. 56-57.) Claimant also stated that he gets fatigued easily and that in general, some days are worse for him than others. (R. 57.) He can get up in the morning with his wife on certain days, but he cannot get out of bed other days. (R. 57-58.) He will not eat before going out in case he needs to use the bathroom urgently. (R. 58.) The hearing concluded with Claimant stating to the ALJ that he is depressed, but that it is his illness that is bringing the depression. (R. 67.)

### D. Vocational Expert's Testimony

Vocational Expert Jacqueline Bethell ("the VE") testified at the June 2, 2014 hearing. (R. 59.) The VE classified Claimant's job at Kraft as a dry food products mixer and, according to the Dictionary of Occupational Title ("DOT"), that work is semi-skilled and heavy exertion. (R. 60.) Next, she classified Claimant's past position as a packing machine operator as unskilled and medium exertion. (*Id.*) The VE opined that Claimant's work as a truck driver was semi-skilled and medium exertion. (R. 60-61.)

The ALJ asked the VE to assume a hypothetical individual with the past jobs she just described that is limited to light work as defined in the regulations. (R. 61.) The ALJ added additional restrictions of no concentrated exposure to humidity and wetness; atmospheric conditions like dust, fumes, odors and gases or weather (outside in both the heat and cold); and extremes of cold and/or heat, such as freezers and blast furnaces. (*Id.*) Additionally, the ALJ stated there would be no climbing ladders, ropes

and scaffolding; and balancing, stooping, kneeling, crouching and crawling would be occasionally, which is defined as zero to one-third of the working day. (R. 62.) The ALJ then asked if, given those limitations, whether such a hypothetical individual could perform any of the past jobs that the VE described. (*Id.*)

The VE responded that such an individual would not be able to perform Claimant's past work. (*Id.*) The ALJ then asked the VE whether in her opinion, there would be any other work available for such an individual. (*Id.*) She responded in the affirmative and explained that such an individual would be able to work as a counter clerk of which there are approximately 2,600 positions in the state of Illinois and 72,000 positions in the nation. (*Id.*) Moreover, such an individual would be able to work as a marker/labeler. (*Id.*) There are 2,000 positions in the state of Illinois and 35,000 positions in the nation. (R. 63.) Finally, such an individual would be able to work as a call-out clerk. (*Id.*) There are 2,900 positions in the state of Illinois and 64,600 positions in the nation. (*Id.*)

The ALJ then asked the VE to reduce the exertion level down to sedentary work, but have everything else remain the same from the first hypothetical. (*Id.*) The ALJ asked if there would be any past work for such a hypothetical person. (*Id.*) The VE responded in the negative. (*Id.*) The ALJ then asked if there would be any other occupations available for such a hypothetical person. (*Id.*) The VE stated that there would be; specifically, such an individual could work as a document preparer. (R. 64.) There are 11,100 positions in Illinois and 242,000 positions in the nation. (*Id.*) Moreover, such an individual could work as a circuit board assembler, of which there are 7,000 positions in Illinois and 154,100 positions in the nation. (*Id.*)

The ALJ then added an additional limitation of five additional times off task, in addition to breaks and lunch, of fifteen minutes duration. (R. 64-65.) The VE stated that the off-task tolerances would rule out work for such an individual altogether. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002); *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz,* 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)); *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 F.3d at 539 (quoting *Steele,* 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to [his] conclusion." *Clifford,* 227 F.3d at 872. At a minimum, the ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important

evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985)).

### B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski,* 245 F.3d at 885–86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from his alleged onset day of March 29,

2007, through his date last insured of March 31, 2013.  (R. 20.)  At step two, the ALJ

found that Claimant had the following severe impairments: sarcoidosis and asthma.  (R.

21.)  At step three, the ALJ found that Claimant did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 22.)  At step four,

the ALJ found that Claimant had the residual functional capacity ("RFC") to lift and/or

carry twenty pounds occasionally, and ten pounds frequently; stand and/or walk about

six hours in an eight-hour work day; and sit about six hours in an eight-hour work day.

(*Id.*)  Claimant could never climb ladders, ropes or scaffolds, but could occasionally

climb ramps and stairs; and could occasionally balance, stoop, kneel, crouch and crawl.

(*Id.*)  In addition, Claimant could not have more than concentration exposure to humidity

and wetness; atmospheric conditions, such as dusts, fumes, odors, and gases; weather

conditions, such as being outdoors on extremely hot or cold days; or extremes of cold

and heat, such as being exposed to freezers or blast furnaces.  (*Id.*)  The ALJ also

found that Claimant is unable to perform past relevant work.  (R. 27.)  However, at step

five, the ALJ found that considering Claimant's age, education, work experience, and

RFC, there were jobs that existed in significant numbers in the national economy that

Claimant could have performed.  (*Id.*)  As a result, the ALJ found that Claimant has not

been under a disability from March 29, 2007, the alleged onset date, through March 31,

2013, the date last insured.  (R. 28.)

 Claimant argues that the ALJ erred in determining his RFC and erred in

assessing his credibility and alleged limitations.  Specifically, it is Claimant's position

that the ALJ did not provide an evidentiary basis for the RFC assessment.  Further,

Claimant contends that the ALJ improperly evaluated Claimant's limitations for a number of reasons. The Court addresses Claimant's arguments in further detail below.

### C. The ALJ Did Not Properly Evaluate Claimant's Limitations.

Claimant claims that the ALJ failed to give legally sufficient reasons for discrediting Claimant's alleged limitations. Since the ALJ issued his decision in this case, the SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms. SSR 96-7p and its focus on "credibility" has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1 (effective March 16, 2016). As SSR 16-3p is simply a clarification of the Administration's interpretation of the existing law, rather than a change to it, it can be applied to Claimant's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016); *Hagberg v. Colvin*, No. 14 CV 887, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016). While the Court will rely on the new guidelines under SSR 16-3, the Court is also bound by case law concerning former SSR 96-7p. *Farrar v.* Colvin, No. 14 CV 6319, 2016 WL 3538827, at *5 (N.D. Ill. June 29, 2016).

Under SSR 16-3, the ALJ must first determine whether the Claimant has a medically determinable impairment that could reasonably be expected to produce his symptoms. SSR 16-3p, 2016 WL 1119029, at *2. Then, the ALJ must evaluate the "intensity, persistence and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id.* An individual's statements about the intensity and persistence of the pain may not be disregarded because they are not substantiated by objective

medical evidence. *Id.* at \*5. In determining the ability of the Claimant to perform work-related activities, the ALJ must consider the entire case record, and the decision must contain specific reasons for the finding. *Id.* at \*4, 9.

The ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding. *Goble v. Astrue*, 385 Fed.Appx. 588, 593 (7th Cir. 2010). However, the ALJ need not mention every piece of evidence so long as he builds a logical bridge from the evidence to his conclusion. *Id.*

Here, the ALJ found that although Claimant alleged disability in March 2007, he was able to perform some level of work activity. Specifically, the ALJ references Claimant's care to his wife's uncle for a period of time. The ALJ also noted that although Claimant reported difficulty walking, he was able to care for his personal hygiene, perform certain household chores, and mow his lawn.

While the ALJ listed certain activities that Claimant was able to do, the ALJ failed to acknowledge the full scope of the actual activities and accompanying limitations. For example, Claimant did care for his uncle when the uncle lived in his home, but Claimant said that the care was limited to making some meals. Further, although Claimant testified that he was able to perform certain household activities, he also stated that he often needed to lie down after mowing his small lawn or doing some chores and could only go to a grocery store if it was small. The ALJ did not acknowledge the breaks that Claimant frequently referenced needing to take when performing certain tasks, instead focusing on the actual tasks performed. *See Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) (*citing Clifford*, 227 F.3d 863 at 872 (To the extent that the ALJ relied on

evidence of Mr. Scrogham's daily activities to determine that he was capable of returning to work, those activities did not constitute "substantial evidence that [he] does not suffer disabling pain," and they "do not establish that [he] is capable of engaging in substantial physical activity.")); *Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir. 2011) (Claimant's ability to struggle through activities of daily living did not mean that she could manage working.); *Gentle v. Barnhart,* 430 F.3d 865, 867 (7th Cir. 2005) (The ALJ improperly equated the ability to do household chores with working in the standard labor market.).

Therefore, the ALJ improperly accorded certain aspects of Claimant's ability to perform select household chores with the ability to work. The ALJ also selectively discussed certain activities from Claimant's testimony without acknowledging the full scope of the household work. The ALJ is not permitted to "cherry pick" from Claimant's testimony about his capabilities to support a denial of benefits. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). While the ALJ's consideration of these limitations along with the activities may not have altered the ALJ's final decision, the fact remains that there was a selective discussion of the evidence on the record and remand is required.

### D. The ALJ Did Not Properly Evaluate Claimant's Residual Functional Capacity.

Claimant argues that the ALJ failed to accurately evaluate his RFC, as the ALJ rejected the medical opinions in the record and instead chose to arrive at his own conclusion regarding Claimant's limitations. The ALJ found, among other things, that Claimant had the RFC to lift and/or carry twenty pounds occasionally, and ten pounds

frequently; stand and/or walk about six hours in an eight-hour work day; and sit about six hours in an eight-hour work day.

In assessing Claimant's RFC, the ALJ noted that Claimant did not submit any treating source opinions and specifically stated: "no treating source has specifically provided an opinion that the claimant was unable to perform basic work activities prior to March 31, 2013." (R. 25-26.) Claimant contends that because there were no treating source opinions to review, the ALJ must have substituted his own opinion for that of a medical professional. Based on the record before this Court, we find that the ALJ was in the proper position to make an RFC determination, but we agree that the ALJ did not sufficiently address all of Claimant's limitations such that the RFC assessment was appropriate.

The determination of RFC is not a medical assessment, but an administrative assessment of what work-related activities a claimant can perform despite his or her limitations. *See* 20 C.F.R. § 404.1545(a); *Diaz v. Charter,* 55 F.3d 300, 306 n. 2 (7th Cir. 1995); *Dixon v. Massanari,* 270 F.3d at 1178. The determination of RFC is an issue reserved to the Social Security Administration ("the Administration"); and in determining what a claimant can do despite his limitations, the Administration must consider the entire record. *Diaz*, 55 F.3d at 306 n.2; 20 C.F.R. § 404.1545(a). This consideration necessarily includes all medical evidence, but also nonmedical evidence, such as the claimant's statement of what he or she is able to do. *Id.* As discussed above, the ALJ did not properly consider Claimant's testimony about his limitations.

Further, the ALJ found that Claimant could stand and/or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day. Claimant's record, however,

contains numerous references to fatigue, leg pain, cramping, and a burning sensation in his feet.  (R. 254, 298, 303, 312, 342.)  He also testified about not being able to walk more than a block before experiencing cramping in his legs.  (R. 53.)  The ALJ noted that although Claimant's cramping in the legs and feet could be related to sarcoidosis, his circulation and nerve tests were normal.  The ALJ, however, is not a physician qualified to make a determination about what a normal circulation and nerve test may mean for sarcoidosis symptoms in the legs.  *See Myles v. Astrue,* 582 F.3d 672, 677 (7th Cir. 2009) (The ALJ may not make an independent medical determination.); *McCristal v. Astrue*, No. 9 CV 7044, 2011 WL 2648591, at *10 (N.D. Ill. July 5, 2011) (The ALJ could not use his own lay opinions to fill in evidentiary gaps in the record.). Here, the ALJ improperly determined Claimant's abilities to stand and/or walk for long periods of time notwithstanding the numerous medical records citing to pain in the legs and fatigue and Claimant's testimony about needing to take breaks.  The ALJ did not build a logical bridge from the medical evidence about Claimant's leg pains to the ALJ's standing and sitting determination.  On remand, the ALJ is to consider the whole record when reaching an RFC determination, properly taking into consideration Claimant's subjective symptoms.

## III.  CONCLUSION

For the aforementioned reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: July 25, 2017**